UNITED STATES, Appellee

v

HOUSTON D. DUKE, Airman Basic,
U. S. Air Force, Appellant

16 USCMA 460, 37 CMR 80

No. 19,582

December 23, 1966

*Lieutenant Colonel William A. Howland, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph Buchta.*

*Lieutenant Colonel William F. Rutherford* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

### Opinion of the Court

QUINN, Chief Judge:

A general court-martial convicted the accused of two specifications of attempted arson at Naselle Air Force Station, Washington, in violation of Article 80 of the Uniform Code of Military Justice, 10 USC § 880. The convening authority and a board of

review affirmed the findings of guilty. As modified on review, the sentence includes confinement at hard labor for four years and a dishonorable discharge. We granted further review to consider two allegations of error as to specification 2.

In part, specification 2 alleges the accused willfully and maliciously attempted to set fire to an "inhabited dwelling, knowing that a human being was therein at the time, to wit: Airman's Dormitory, Building Number 146." At trial, the Government established that the building was used to house some of the base personnel. At 4:00 a.m., on October 1, 1965, a fire alarm awakened the occupants of the building. Some of them discovered a fire in the TV room on the first floor. They succeeded in putting it out. Later investigation by the Deputy Fire Chief of McChord Air Force Base, Washington, indicated the fire was due to "human intervention." Office of Special Investigations agents interrogated the accused about the incident. After proper advice as to his rights under Article 31, Code, supra, 10 USC § 831, and of his right to counsel, the accused admitted he deliberately set both fires. He offered "no reason" for his conduct except that he "just wanted to see a fire."

The accused defended against the charges on the ground he lacked capacity to commit the offense because of a psychosis and severe intoxication. Each aspect of the defense was the subject of separate instructions. In a preliminary hearing on these, and other instructions, defense counsel extended his "compliments" to the law officer for their formulation. On this appeal, however, the accused contends the instructions as to specification 2 "failed to provide the court members with lucid, meaningful guideposts." He maintains they did not clearly differentiate accused's mental capacity to entertain the specific intent to set fire to an inhabited dwelling and his mental capacity to know a human being was inside the structure when he attempted to set fire to it. The accused also contends the staff judge advocate's post-trial advice to the con-

vening authority on the correctness of the instructions was erroneous and prejudicial. The staff judge advocate indicated the law officer's instructions on knowledge of human presence were "unnecessary" because knowledge is not an "essential element," where, as here, the attempted burning involves an "inhabited dwelling." Since the correctness of the instructions and the validity of the staff judge advocate's advice turn on the elements of the offense of arson, we consider first the definition of the offense in the Uniform Code of Military Justice.

Arson is defined in Article 126 of the Uniform Code, supra, 10 USC § 926. The Article distinguishes between two types of arson, aggravated and simple. Aggravated arson is committed when a person subject to the Uniform Code "willfully and maliciously burns or sets on fire" certain kinds of structures. In the language of the Article, these are described as follows: "an inhabited dwelling, or any other structure, movable or immovable, wherein to the knowledge of the offender there is at the time a human being." The accused construes this language to require the presence of a human being, whether the structure is an inhabited dwelling or any other type of structure. He draws some support for his argument from the fact the specification alleges both that the barracks was an "inhabited dwelling" and that the accused had knowledge of the presence of another person therein.

A casual reading of Article 126 is not, as the Government maintains, entirely inconsistent with the accused's argument. However, the history of the offense in military law and the consideration of it in the enactment of the Uniform Code are contrary to his construction of the Article.

Excluding certain special types of property, such as arsenals (18 USC § 465 (1940 ed)), military law previous to the Uniform Code defined arson in common-law terms. Naval Courts and Boards, 1937, § 124, page 120, for example, observed that the offense "is substantially the common law crime

of arson, and should be so charged." The Army law and practice manual described the offense as "the willful and malicious burning of the dwelling house or outhouse of another." Manual for Courts-Martial, U. S. Army, 1949, paragraph 180c. The description parallels the definition most widely used at common law. See 6 CJS, Arson, § 1. Winthrop's learned treatise on military law indicates that, from at least 1863, the earliest time the offense was made directly triable by courts-martial in the Army, arson was defined as the malicious burning of the house or dwelling of another. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 680–682. With some elaboration, the common-law definition was also used in the Federal civilian penal code. Revised Statutes § 5385, later 18 USC § 464, now 18 USC § 81. This definition, in turn, was used as a guide by the Navy. Naval Courts and Boards, supra, page 120. Indubitably, therefore, before the Uniform Code, arson in military law embraced the elements of the offense defined by the common law.

In its common-law form, arson did not require that a person other than the arsonist be present in the dwelling at the time he set fire to it. See Sawyer v State, 100 Fla 1603, 132 So 188, 193 (1931); 3 Burdick, The Law of Crime, § 695 (1946). At common law, therefore, allegation and proof of the accused's knowledge that a human being was present in the dwelling were not required. 6 CJS, Arson, § 9, page 729. See also Winthrop, op. cit., page 681. Since military law antecedent to the Uniform Code followed the common law, it, too, did not require allegation and proof of the presence of another human being in the structure at the time of the accused's act. Naval Courts and Boards, supra, page 120; Manual for Courts-Martial, U. S. Army, 1949, page 236, and Appendix 4, Form 88, page 323. It is also worth noting that, notwithstanding the absence of a human being from the dwelling at the moment of burning, the offense was punishable by confinement at hard labor for twenty years. Id., Table of Maximum Punishments, page 137; Naval Courts and Boards, supra, page 240. That is the same penalty for aggravated arson under the Uniform Code. Manual for Courts-Martial, United States, 1951, Table of Maximum Punishments, paragraph 127c, page 224. The question then is whether Article 126 changed the existing law to require that a human being be present in the dwelling at the time it is set on fire.

As originally drafted, Article 126 divided arson into two degrees. The more serious degree, or aggravated arson, was the only form of arson directly reflected in the Articles of War. The new proposal required that the structure be "a dwelling in which there is at the time a human being, or any other structure . . . wherein to the knowledge of the offender there is at the time a human being." Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1233. Apparently, the proposed article was intended to "set forth some general provisions normally found in modern penal laws." Id., page 605, Statement of Professor Edmund M. Morgan, Jr., Chairman of the Department of Defense Committee appointed by Secretary of Defense Forrestal to prepare the Uniform Code of Military Justice. Many States had changed the common-law conception of arson to establish different degrees of the offense and to provide different punishments, depending upon the presence of a human being in the structure at the time of the burning. See People v Nagy, 199 Cal 235, 248 Pac 906 (1926). The commentary on the proposed article indicated its definition of aggravated arson was "essentially common-law arson," enlarged to cover structures other than dwellings. House Hearings, supra, page 1233. The Armed Services Committee, however, did not adopt the Morgan Committee draft bill. Instead, it submitted a "clean bill," H. R. 4080, to Congress. House Report No. 491, 81st Congress, 1st Session, page 2. This new bill changed the language of the Morgan draft of Article 126. In place of the proposed phrase "a dwelling in which there is

at the time a human being," it substituted the words "an inhabited dwelling." House Report No. 491, 81st Congress, 2d Session, page 105.

No reason for the change of language in Article 126 is apparent in the record of the hearings on the proposed Uniform Code. It is discussed briefly in a statement by a witness, but his comment is limited to a suggestion that the definition of simple arson be "phrased less loosely" than it appeared in the Morgan draft. House Hearings, supra, page 815. There are, however, other indicia of the intent of the Committee on Armed Services in effecting the change.

We pointed out earlier that the commentary accompanying the Morgan draft of Article 126, represented the aggravated arson defined therein as "essentially common-law arson," "enlarged" to include the burning of any structure in which a human being was present. We have also seen that, where the structure was a dwelling, the common law did not require the actual presence of a human being at the time of the commission of the offense. That point was explicitly covered in the discussion of arson in both of the service manuals on military law. The failure to detect the difference might merely have been due to the fact that the proposed article was only "considered briefly" by the Morgan Committee. Memorandum to the Judge Advocate General of the Navy, dated December 20, 1948, from Colonel John E. Curry, United States Marine Corps, member of the Working Group of the Morgan Committee, filed in Library, United States Court of Military Appeals. Whatever the explanation, however, the Morgan Committee commentary made direct reference to Article of War 93 and Naval Courts and Boards, 1937, § 124. House Hearings, supra, page 1233. It is reasonable to infer that the substance of these references became known to the Congressional Committee members before it made the change in the Morgan draft article. See United States v Schuering, 16 USCMA 324, 36 CMR 480.

A comparison of the references cited in the Morgan commentary with the discussion of the offense of arson in the service manuals discloses that, in the case of a dwelling, proposed Article 126 introduced a new requirement of actual human presence in the structure. The proposed article, therefore, constituted a narrowing, rather than an enlargement, of arson, as it obtained in the military. Its language was inconsistent with the commentary statement that the offense defined in the draft article was "essentially common-law arson." It is apparent, therefore, that the Armed Services Committee undertook to conform the proposed article to the intention of the draftsmen, that is, to spell out common-law arson, with the enlargements recommended by them. Certainly, the language it adopted more nearly defines the offense as it was defined in common law and in the then existing military law. In addition, the Report it submitted with its own bill very definitely discloses an intention to accept the existing service manuals' definitions of civilian-type crimes. In pertinent part, the Report reads as follows:

". . . Most of the civil types of crimes are not defined in existing military law and there are some differences in the crimes which are defined. The civil types of crimes in the Articles of War, as defined by the Manual, are generally based on the common-law definition of the State of Maryland which, as a matter of fact, is very close to Federal definitions of the same offenses. Comparable crimes are enumerated in the Articles for the Government of the Navy but are not therein defined. However, Naval Courts and Boards, which defines the crimes, generally follows the Federal statutory definitions. All of these differences have been reconciled in writing the punitive articles of this code." [House Report No. 491, 81st Congress, 1st Session, page 35.]

Despite its legislative history, appellate defense counsel contend that the language of Article 126 makes knowledge of the presence of a human being in the building an essential ele-

ment of the offense regardless of whether "an inhabited dwelling or other structure" is involved. See United States v Hicks, 6 USCMA 621, 20 CMR 337. The words "inhabited dwelling" can themselves be construed to mean that a human being must be present in the dwelling at the time of the burning; or they may merely emphasize the common-law requirement that the structure be in fact used for habitation at the time of the offense. Each view has found favor in the construction of similarly worded statutes. See 2 Bishop, A Treatise on Criminal Law, 9th ed, § 17, footnote 2; cf. § 220.1, American Law Institute, Model Penal Code, Proposed Official Draft, May 4, 1962. If the term is construed to mean a human being must be present, then the succeeding clause on human presence is redundant and unnecessary. Also, such construction changes the nature of the offense in a material respect. On the other hand, if the term is construed to connote that the dwelling must be used as such, then this part of the Article carries the existing law into the Uniform Code. A criminal statute should, as appellate defense counsel contend, be construed as strictly as possible. Consistently with its language, however, it should not be construed to defeat the clear intention of Congress. That construction must be adopted which best effectuates the language and purpose of the provisions of the act. See United States v Margelony, 14 USCMA 55, 33 CMR 267. We are persuaded by the change effected by Congress in ▮▮▮▮▮▮ ▮ the language of Article 126, as originally proposed by the Morgan Committee, and by that Committee's intention to enlarge the definition of arson as it then existed in military law, that "inhabited dwelling" means the structure must be used for habitation, not that a human being must be present therein at the time the dwelling is set on fire. We conclude, therefore, that human presence is not an element of the offense of arson, within the meaning of Article 126, when an inhabited dwelling is burned.

Our conclusion as to the essential elements of arson based on the burning of an inhabited dwelling sustains the staff judge advocate's advice thereon. It also makes it unnecessary to consider the details of the accused's claim of error in the instructions. The law officer's instructions required the court members to find beyond a reasonable doubt both that the building was an inhabited dwelling and that the accused knew there was a human being therein at the time of his act. Even if we were to assume error in the later instructions as to the effect of the accused's mental condition on the element of knowledge of the presence of a human being, the error did not extend to the court-martial's determination that the structure was an inhabited dwelling. The mental condition of the ▮▮▮▮▮▮ ▮ arsonist is unrelated to, and has no effect upon, whether a structure is a dwelling being used as a habitation or is some other type of building. As the law officer pointed out in his instructions, the character of the structure depends upon its use; if it is, he said, "occupied as a place of residence or abode," it is an " 'inhabited dwelling.' " On this basis the error was not prejudicial. United States v Duckworth, 13 USCMA 515, 521, 33 CMR 47.

To escape the sufficiency of the unassailable findings to support the accused's conviction for ▮▮▮▮▮▮ ▮ aggravated arson, appellate defense counsel contend that the allegation in the specification and the law officer's instructions established, as the " 'law of the case,' " that knowledge of actual presence of another person in the barracks was an essential element of the offense. An allegation in the specification which is unnecessary to prove the offense and does not contradict any material allegation can generally be disregarded as surplusage. Tomlinson v United States, 93 F2d 652 (CA DC Cir) (1937), certiorari denied, 303 US 646, 82 L ed 1107, 58 S Ct 645 (1938); cf. United States v Smith, 15 CMR 510, 511. Similarly, an erroneous instruction on an unnecessary

matter does not impair the legal effect of proper findings of fact by the court-martial. United States v Duckworth, supra. In any event, we have examined the instructions carefully and, considering the "compliments" emanating from defense counsel, we are satisfied there was no fair risk that the court members were confused as to the effect of the evidence of the accused's mental condition. United States v Sweeney, 14 USCMA 599, 34 CMR 379.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

Judge FERGUSON concurs in the result.